1
2
3
4
5
6
7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  GREGORY S. MEYERS,                    No. CIV S-05-2540-CMK

12            Plaintiff,

13      vs.                         MEMORANDUM OPINION AND ORDER

14  COMMISSIONER OF SOCIAL
    SECURITY,
15
              Defendant.
16  _____/

17          Plaintiff, who is proceeding with retained counsel, brings this action for judicial

18  review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

19  Pursuant to the consent of the parties, this case is before the undersigned for final decision on

20  plaintiff's motion for summary judgment (Doc. 15) and defendant's cross-motion for summary

21  judgment (Doc. 19).

22                          **I.  PROCEDURAL HISTORY**

23          Plaintiff applied for social security benefits on January 18, 2002.  In his

24  application, plaintiff claims that his disability began on May 15, 2000.  Plaintiff claims his

25  disability consists of a combination of numbness in his hands and feet, back problems, shoulder

26  pain and coordination problems.  Plaintiff is a United States citizen born January 25, 1960, with a

                                        1

high school education.  Plaintiff's claim was initially denied.  Following denial of his request for reconsideration, plaintiff requested an administrative hearing, which was held on March 30, 2004, before Administrative Law Judge ("ALJ") Robert K. Rodgers, Jr.

In his October 13, 2004, decision, the ALJ made the following findings:

1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.   The claimant's cervical and lumbar degenerative disc disease and ataxia are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4.   These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.   The [ALJ] finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.   The [ALJ] has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR 404.1527 and 416.927).

7.   The claimant has the residual functional capacity to perform a full range of light work, except he requires an at will sit/stand option.  He cannot work at unprotected heights or around dangerous machinery.  He can understand, remember and carry out simple repetitive job instructions and tasks; but not detailed or complex job instructions or tasks.

8.   The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

9.   The claimant is a "younger individual between the ages of 18 and 44" (20 CFR §§ 404.1563 and 416.963).

10.  The claimant has a "high school education" (20 CFR §§ 404.1564 and 416.964).

11.  The issue of transferability of work skills is not material  (20 CFR §§ 404.1568 and 416.968).

12.  The claimant has the residual functional capacity to perform a significant range of light work  (20 CFR §§ 404.1567 and 416.967).

13.     Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rules 202.20-.22 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.

14.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not entitled to benefits.  After the Appeals Council declined review on May 11, 2005, this appeal followed.

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following:  (1) medical records from Concentra Medical Center covering the period from May 6, 1999, through March 3, 2000 (CAR 105-132); (2) a medical report from Eric Robbins, MD, dated May 14, 1999 (CAR 133-135); (3) a medical report from Joseph Fillmore, MD, dated June 9, 1999 (CAR 136-139); (4) a medical report from Lynn Parry, MD, dated June 19, 2001 (CAR 140-147); (5) medical records from Alpine Co. Health for September 25, 2001, through October 16, 2001 (CAR 148-150); (6) medical records from Barton Memorial Hospital for October 3, 2001, though September 9, 2002 (CAR 151-172); (7) a medical report from Steve McIntire, MD, dated May 25, 2002 (CAR 173-176); (8) medical records from Tahoe Fracture Clinic (Drs. Mullen, Lagios and Jones) for November 23, 2001, through March 15, 2004 (CAR 177-192; 201-249); (9) a physical residual functional capacity assessment dated June 27, 2002 (CAR 193-200); (10) a medical report from Rajiv Pathak, MD, dated July 9, 2004 (CAR 250-260); and (11) a psychological evaluation report from Jeffery Shively, Ph.D. dated June 8, 2004 (CAR 261-271).

The medical records indicate that plaintiff suffered from a back injury following an automobile accident in 1989 or 1990.  Following surgery, a lumbar laminectomy, he had a full recovery and returned to work.  Then on May 2, 1999, he injured his back at work while delivering a Jacuzzi.

<u>1999</u>

Plaintiff was seen by Roxana Witter, MD, at Concentra Medical Center on May 6, 1999.  He complained of back pain and spasms.  Dr. Witter assessed that plaintiff had a lumbar strain with radiculopathy consistent with an L4 disc and a cervical spine strain.  He was given Ibuprofen, Vicodin, and Flexeril.  Physical therapy was ordered and he was given work restrictions, including ten pound lifting and pushing/pulling, no reaching over shoulders and no bending more than five times in an hour.  He had an MRI done on May 14, 1999, which identified enhancing epidural fibrosis in the anterior epidural space at L4-5 and L5-S1, and enhancing material consistent with granulation tissue in the posterior aspects of the L4-5 and S1-2 discs.  The MRI also showed minimal residual protruding disc material well to the left and well to the right of the midline at L4-5 and well to the right of the midline at L5-S1 and larger far left posterior protrusion at L5-S1.  However, no neural structures were contacted by the protruding disc material at either of these two levels.  The MRI further showed mild degenerative spondylosis anteriorly at L5-S1.

On May 24, 1999, plaintiff reported pain with sitting and standing, and with toe walking.  His forward flexion was 45 degrees then had radiating pain, his extension was at 10 degrees.  He had seven physical therapy sessions between May 11, 1999, and June 17, 1999.  In June 1999, he was approved for returning to work, with modified activity including no repetitive lifting over ten pounds, no bending more than six times per hour, and no pushing/pulling over ten pounds of force.

On June 9, 1999, plaintiff was evaluated by Dr. Fillmore for worker's compensation.  Upon examination, Dr. Fillmore found plaintiff had some muscle imbalance and cervical spine strain without signs of radiculopathy, and a possible mild impingement to the right shoulder with muscle imbalance.  Plaintiff displayed mild weakness in the abductors of the right shoulder and equivocal signs of impingement with provocative testing.  He also showed signs of low back pain and L5 weakness on the left.  He had questionable L5 radicular signs on the right

evidenced by decreased sensation in the plantar aspect of the right toe.  There was no weakness

in the right lower extremity.  His MRI evidenced epidural fibrosis and an L4-L5 and L5-S1 with

disc protrusion at L5-S1.[1]

2000

On March 3, 2000, plaintiff was seen again at the Concentra Medical Center for a

reevaluation.[2]  He continued to report significant pain.  Upon examination, Dr. Amick noted

some abnormal curvature of his spine with moderate paraspinal spasm in the musculature.

Forward flexion was 45 degrees and extension was 10 degrees.  Reflexes were 2+ throughout his

lower extremities.  Strength was 5/5, although it did increase the pain in his low back.  Straight

leg raise elicited pain in his low back, but without radiating pain.  His diagnosis was herniated

disc, low back.  Dr. Amick did not believe plaintiff was at maximum medical improvement, and

thought physical therapy might be beneficial.

2001

Plaintiff was then examined by Dr. Parry on June 19, 2001, again for worker's

compensation.  Dr. Parry also opined that plaintiff was not at maximum medical improvement.

Upon examination, Dr. Parry found plaintiff had a maximal cervical flexion of 55 degrees,

maximal cervical extension of 37 degrees, right lateral flexion of 23 degrees but left lateral

flexion of only 1 degree.  Plaintiff had 50 degrees of right rotation and 52 degrees of left rotation

in the cervical region.  He had a definite scoliotic curve, and his pelvis was shifted to the right,

rotating the left scapula and shoulder upward and the curve of the thoracic spine to the right.  He

had almost no lumbar flexion with the predominant movement occurring at the hip.  He had a 15

---

[1]    Because Dr. Fillmore was evaluating plaintiff in regards to a possible worker's compensation injury, in his report showed some concern about which symptoms plaintiff had that were caused by his old back injury and which were caused by his new injury.  The court is not concerned with the difference.

[2]    There apparently was a time when plaintiff did not receive medical care due to issues with his insurance and worker's compensation.

degree lumbar flexion with a maximal of 47 degree sacral movement and 13 degree lumbar extension with 10 degree sacral extension.  His positive straight-leg-raising was 60 degrees on both the right and left.  For validity criteria this provides valid lumbar flexion with sacral range-of-motion being 57 degrees and his tightest straight-leg-raising at 60 degrees.  Lumbar flexion was limited on the right with only 10 degrees right lumbar flexion.  He had 25 degrees of left lumbar flexion, upper extremity strength distally was fairly good with good biceps, triceps, strength and some limitations from pain in the shoulder.  The reflexes could be elicited in both upper extremities at the triceps, biceps and brachioradialis.  Sensory examination showed C6 loss on the right, normal sensation on the left to pin prick and vibratory sense.  In the lower extremities, his reflexes were 2+ at both knees, 1+ at the left ankle and no ankle jerk could be elicited on the right even with reinforcement.  Mild decreased pin prick sensation in what appears to be the L5 territory on the left but could not elicit any sensory abnormalities on the right.  Gait and station were fairly good with the ability to toe walk and some discomfort with heel walking.

Dr. Parry was not provided with a complete set of medical documents, but her impression upon examination was that plaintiff has both depressive and rotational forces which have resulted in muscle injuries to the upper back, significant muscle spasm and significant ongoing muscle imbalance with resultant pelvic shift, scoliotic curve and scapular dysfunction. In addition he had radicular symptoms.  There was no evidence of focal nerve root compression by his MRI.  There was evidence of prior fibrosis and with ongoing imbalance through the spinal axis, he could have additional traction causing increased symptoms.  Because Dr. Parry did not have all of plaintiff's medical records, there were a number of tests and treatments she recommended and she could not provide any type of permanent rating or limitations.

On October 31, 2001, plaintiff had a cervical spine x-ray.  The impression was a mild narrowing of the neural foraminal canal C3-4 and C5-6 on the left.  It appeared to be primarily due to degenerative osseous changes.  The discs were not visualized on plain films, but there was a loss of disc height at C5-6 and C6-7.

1       <u>2002</u>

2       Dr. McIntire performed a comprehensive orthopedic evaluation on May 25, 2002.

3  Dr. McIntire found plaintiff's coordination, station and gait were within normal limits, and he

4  could walk on his heels, toes and tandem.  He had no foot drop, and Romberg was absent.

5  Plaintiff did not use any assistive device nor were any indicated.  Plaintiff's range of motion in

6  the cervical region was flexion 45 of 50 degrees, extension 50 of 60 degrees, lateral flexion 40 of

7  45 degrees left and right, and rotation 70 of 80 degrees left and right.  In the lumbar region, his

8  range of motion was grossly normal.  At the hip joints, he had forward flexion 0-100 degrees,

9  backward extension 0-30 degrees, rotation-interior 0-20 degrees, rotation-exterior 0-30 degrees,

10  abduction 0-25 degrees, and adduction 0-15 degrees bilaterally.  Plaintiff's knee, ankle, shoulder,

11  elbow and wrist joints were all grossly normal bilaterally.  His straight leg raising and Lasegue

12  were negative bilaterally.

13       Dr. McIntire found that there was a slight flattening of the normal lumbar

14  curvature, a slight scoliosis of the lower thoracic and lumbar spine, but no significant tenderness,

15  and no guarding of the back when plaintiff was seated or getting on or off the exam table.

16  Plaintiff had slight tenderness diffusely over the lower cervical region.  There was a loss of range

17  of motion of the cervical spine, but no paraspinal muscle spasm and no abnormalities of his head

18  or neck posture was exhibited during the exam or history taking.  Plaintiff's muscle bulk and

19  tone were normal, his motor strength was 5/5 proximally and distally throughout the upper and

20  lower extremities.  His fine finger movements were rapid and symmetric, with no drift.  Plaintiff

21  had patchy distribution sensory changes diffusely in the right lower extremity which did not fall

22  into a clear radicular or dermatomal distribution.  There was no complete sensory loss.  Deep

23  tendon reflexes were symmetric and within normal limits throughout the upper and lower

24  extremities.

25       Dr. McIntire gave the diagnoses of status post lumbar laminectomy and

26  degenerative osteoarthritis of the cervical and lumbar spine.  In his functional assessment, Dr.

McIntire, who had no imaging results to review, found that objectively plaintiff did not have findings to suggest an ongoing cervical or lumbar radiculopathy or a myelopathy.  However, plaintiff did have a loss of range of motion in the cervical and lumbar regions and very slight scoliosis of the lumbar spine.  He had a stable gait and did not exhibit guarding of the back when seated.  Dr. McIntire opined functional limitations of lifting or carrying not more than ten pounds frequently or 20 pounds occasionally.  Dr. McIntire found the examination did not point to other limitations in terms of time sitting, standing or walking, and no postural, manipulative, environmental, communicative or cognitive limitations were suggested by the exam.

On June 17, 2002, Plaintiff saw Dr. Jones at the Tahoe Fracture Clinic.  Dr. Jones noted that plaintiff had good range of motion in his neck, motor strength testing was 5/5 in all groups with normal sensation, and his reflexes were 2+ at the biceps, triceps and brachioradialis.  Plaintiff had negative straight-leg-raises, his motor strength in his lower extremities was 5/5 on the right, but his left side has some breakaway weakness at 4+/5 in his quadriceps, hamstrings and dorsiflexors.  His EHL was 5/5, his plantar flexors were 5/5, sensation was decreased in an S1 distribution on the right side as compared to the left and decreased sensation bilaterally in an L5 distribution.  He had no ankle clonus, his toe responses were down-going.  His cervical spine showed cervical spondylosis with anterior osteochondral defect at 4-5, 5-6 and 6-7, but no gross instability was noted.  Plaintiff's lumbar spine showed a previous laminectomy defect from L4 to the sacrum, but no gross scoliosis was noted on the lumbar films.  There was a disc space collapse at 5-1 with transitional segment noted.

On June 27, 2002, plaintiff had a physical residual functional capacity (RFC) assessment.  The RFC found plaintiff able to occasionally lift 20 pounds, frequently lift ten pounds, stand or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and an unlimited ability to push or pull.  The explanation for these findings included that the orthopedic exam from May 25, 2001, showed plaintiff's gait was within normal limits, he could walk on his heels, toes and tandem, his lumbar spine was noted for slight

flattening of the normal lumbar curvature, a slight scoliosis of the lower thoracic and lumbar spine, no significant tenderness, straight leg raises and Laseque's were negative, his motor strength was 5/5 throughout, he had patchy distribution sensory changes diffusely in the right lower extremities,  no complete sensory loss, his deep tendon reflexes were symmetric and within normal limits.  No postural, manipulative, visual, communicative, or environmental limitations were established.  These findings were not significantly different findings than treating or examining source.  The RFC found Dr. McIntire's opinion to be reasonably well supported by appropriate medical findings and not inconsistent with the overall evidence in file. Substantial weight was given to Dr. McIntire's opinion when assessing plaintiff's RFC.

On September 8, 2002, plaintiff had MRIs of both the cervical and lumbar spine. The cervical spine MRI showed minimal disc bulge without evidence for central or neuroforaminal stenosis at the C4-5 level.  It also showed posterior disc osteophyte complex and moderate central and moderate bilateral neuroforaminal stenosis at the C5-6 and C6-7 levels, and moderate left neuroforaminal stenosis at the C3-4 level.  The lumbar spine MRI showed a disc bulge, a broad based central and left paracentral disc protrusion at the L4-5 which causes mass effect upon the anterior aspect of the thecal sac and causes mass effect and deformity of the left L5 nerve root.  It also showed what appeared to be a small disc fragment projecting posterior to the central aspect of the L5-S1 disc without significant mass effect, and a left paracentral/ proximal neuroforaminal disc protrusion, also without significant mass effect.

Plaintiff then saw Dr. Jones again on September 10, 2002.  Dr. Jones found plaintiff's lumbar MRI showed significant degenerative disease from L4 to S1 with rudimentary S1-S2 disc material, Modek changes consistent with longstanding injuries to his disc, and cross sections showed broad-based bulging and free fragments at 4-5 and 5-1.  His cervical MRI showed some cervical spondylosis with foraminal encroachment, worse at the 5-6 and 6-7 level.

On November 12, 2002, plaintiff saw Dr. Mullen at the Tahoe Fracture Clinic. Dr. Mullen noted plaintiff's history of neck, mid and lower back pain.  He also noted plaintiff's

recent x-rays of the cervical spine demonstrated cervical spondylosis between C4-5, C5-6 and

C6-7, and an MRI scan demonstrated cervical spondylosis between C5-6 and C6-7.  His recent

MRI of the lumbar spine demonstrated degenerative disc disease between L4 and S1 along with

rudimentary L5-S1 disc complex.  Dr. Mullen observed that plaintiff walked with slightly ataxic

gait with his left leg extremely rotated.  Plaintiff was able to walk on his heals and toes, but had

some difficulty with balance.  He had a little bit of left facial weakness and some left facial tics,

almost like there was a tardive dyskinesia.  Plaintiff guarded his neck.  His shoulder range of

motion was grossly intact with a full 180 degrees of abduction and extension, and he had full

internal and external rotation of the arms.  His motor strength in his upper extremities was

grossly 5-/5.  His sensation was diminished throughout the hands in a stocking glove distribution.

His reflexes were +3 and symmetrical with upper motor neuron signs.  His straight leg raise was

limited to about 60 degrees with extreme hamstring tightness.  His hip internal and external

rotation was pain free.  He had only minor tenderness over the posterior lumbar paraspinals and

upper gluteal region, even with heavy pressure.  His motor strength in his lower extremities was

grossly 5-/5, and his sensation was intact.  His reflexes were +3 and symmetrical.  There was

negative clonus and negative Babinski's.  No objective evidence for nerve pathology in the

lumbar spine was noted.  Plaintiff demonstrated abnormal movements and tics, more noticeable

in his face and hands than his legs, the etiology of which was unclear.  Dr. Mullen noted that

plaintiff's subjective symptoms and functional inabilities far outweighed any objective evidence

for spinal disease or nerve disruption.  His functional limitations were due more to balance and

behavioral disorders than due to his spinal problems.  Dr. Mullen also noted that occasionally,

Soma can cause ataxia, tremor and agitation.

        Plaintiff saw Dr. Mullen again on November 26, 2002.  His EMG/NCS (electro-

diagnostic study) was essentially normal, and there was no evidence of a lower motor neuron

disorder.  There was no evidence of axonal degeneration or demyelinization, no electrical

evidence for cervical or lumbar radiculopathy, polyneuropathy, peripheral neuropathy,

demyelinating disease, or myopathy.  Dr. Mullen was concerned with plaintiff's unusual

extrapyramidal symptoms, constant tics, abnormal movements, pill rolling behaviors in his hands

and abnormal balance.

2003

On January 16, 2003,  Dr. Mullen gave plaintiff a lumbar epidural injection.  In

April 2003, Dr. Mullen noted the epidural injection decreased plaintiff's pain fairly significantly.

His pain medication was changed to OxyContin, and he was cutting back on the Vicodin.

On May 23, 2003, plaintiff saw Dr. Lagios for an evaluation of his involuntary,

extrapyramidal type symptoms.  Plaintiff reported he had been experiencing involuntary

movements, some unsteadiness of gait, and complained of decreased sensation in his hands and

legs.  Dr. Lagios noted his involuntary movements looked tic-like, and that plaintiff also made

sniffling sounds, which could be vocal tics as well.  Plaintiff denied having these symptoms as a

child, which Dr. Lagios noted makes Tourette's syndrome less likely.  Dr. Lagios also noted that

involuntary movements can be seen with narcotics and other medications, including stimulants.

Plaintiff denied taking any stimulants, and he stated that he had these involuntary movements

before he was on narcotics for pain.  Dr. Lagios noted other causes of involuntary movements

could be a degenerative spinal cerebellar type syndrome, Wilson's disease, or one of metabolic

and toxic conditions.  He suggested plaintiff obtain an MRI of the brain and some blood work.

Given the normalcy of plaintiff's electrical studies, Dr. Lagios suggested that if not related to his

peripheral nerve, plaintiff's decreased sensation in his hands and feet either have to be central or

nonorganic.  He also suggested that demyelinating disease may need to be considered.

On May 27, 2003, Dr. Mullen noted plaintiff's overall functioning was about 80

percent better, but also noted that plaintiff continued to have abnormal tremors and loss of

balance.  Plaintiff reported a flare-up of his lower back pain on May 29, 2003.  He then received

another epidural injection on June 3, 2003, which Dr. Mullen found "worked wonderfully."  Dr.

Mullen wanted plaintiff's Vicodin discontinued, allowed him to continue with his OxyContin,

but wanted plaintiff to slowly taper off the OxyContin.  On June 24, 2003, Dr. Mullen noted that plaintiff had some improvement with the epidural injections, and allowed plaintiff to continue both the OxyContin and Vicodin intermittently.  Dr. Mullen opined that plaintiff's spinal injury was permanent and stationary, that he had a ratable impairment and he would recommend a permanent partial disability evaluation.  As for his return to work status, from an industrial status as to his neck and lower back, Dr. Mullen opined that plaintiff would be able to return to work on a light duty status.  However, given plaintiff's central neurological problems of tics, tremors and loss of balance, Dr. Mullen opined that plaintiff would be unemployable.  Dr. Mullen did sign a return to work form, allowing plaintiff to return to light duty with a lifting restriction of 30 pounds and no repetitive twisting or bending.

Plaintiff saw Dr. Mullen again a few times between September 23, 2003 and January 13, 2004.  Dr. Mullen continued to recommend plaintiff receive a neuropsychiatric evaluation.  Plaintiff continued to take Vicodin, Desyrel, Zanaflex, and Celebrex.  However, Dr. Mullen suggested again that he discontinue all narcotic pain medication.  Dr. Mullen noted that the follow-up he recommended with Dr. Lagios and Dr. Linn, as well as the MRI of the brain and the blood studies, were not completed due to financial and insurance issues.

<u>2004</u>

On July 9, 2004, Dr. Pathak completed a neurological consultation examination of plaintiff.  Dr. Pathak's report indicated plaintiff used a cane, which he reported he had been using for about two years.  Upon examination, Dr. Pathak found plaintiff's cervical spine range of motion was limited normal with flexion 20/30 degrees, extension 20/30 degrees, and lateral flexion 30/40 degrees bilaterally.  He had some mild spasm and tenderness of the cervical paraspinous muscles.  Plaintiff's lumbar spine had severe spasm of the lumbar paraspinous muscles, but normal contour.  His finger to floor distance was six inches, and his range of motion was limited with flexion 60/90 degrees, and lateral flexion 10/20 degrees bilaterally.  His straight leg raising test was positive on the right side at 60 degrees.  His shoulders, elbows, writs, hands,

1   fingers, hips, knees, and ankles had normal range of motion bilaterally without any warmth,

2   swelling or tenderness to palpation.   His facial movements were symmetric and his facial

3   sensations intact.  There was mild rigidity of both plaintiff's arms, as well as mild bradykinesia.

4   His strength was 5- out of 5 in both arms and both legs except for his hip flexors, where it was

5   4+ out of 5.  He reported decreased sensation to both hands, both feet, and both legs.  His

6   reflexes in his biceps, triceps, brachioradialis, knee and ankle were 3+ on the right side and 2+ on

7   the left side.  As for plaintiff's station and gait, he arose easily from the examination table, but

8   was unable to stand with his feet together, even with eyes open.  Dr. Pathak found that Romberg

9   was markedly positive.  Plaintiff was unable to tandem walk, and walks with the help of a cane.

10  MRI studies of the cervical and lumbar spine did not show any cord compression, but it did show

11  bilateral neural foraminal stenosis.

12          Dr. Pathak's findings were that plaintiff had limited range of motion of the

13  cervical spine and lumbar spine, neck and low back pain, which was mechanical without any

14  clinical evidence of radiculopathy.  Dr. Pathak found it interesting that plaintiff had ataxia,

15  involuntary movements, and on examination, decreased sensation in both hands and both feet.

16  He opined that these findings were more likely due to primary central nervous system process

17  affecting plaintiff's brain, and stated multiple sclerosis would be a primary concern.  Plaintiff had

18  some hyperreflexia on the right side compared to the left, and his cerebellar examination also

19  showed slow alternating movements on both sides.  Overall, Dr. Pathak's impression was that

20  plaintiff does have primary central nervous system process.  The differential would be multiple

21  sclerosis as a primary concern, but other hereditary spinocerebellar degeneration would also be

22  possible, and found that getting an appropriate MRI of plaintiff's brain would help in the

23  differentiation.

24          Dr. Pathak opined that plaintiff's limitations include occasionally lifting ten

25  pounds, frequently lift 20 pounds, standing or walking at least two hours in an eight-hour

26  workday, sitting about six hours in an eight-hour workday, and that his pushing/pulling is limited

in both the upper and lower extremities.  He found plaintiff had poor balance, hyperreflexia on the right side, mild generalized weakness, a history of involuntary movements (which were not seen during the exam), rigidity in both arms, decreased sensation, and slow alternating movements on both sides.  Plaintiff's postural limitations would include occasional climbing and balancing, and never kneeling, crouching, crawling, or stooping.  Plaintiff's manipulative limitations would include occasionally reaching, handling, fingering, and feeling due to decreased sensation.

On June 4, 2004, plaintiff had a psychological evaluation by Dr. Shively.  Dr. Shively noted that plaintiff presented with a disheveled appearance, including body odor, unshaven face and a tee-shirt with a hole in it.  He had below average energy, and although he acknowledged taking his pain medication, he denied any alterations in his consciousness other than keeping him tired.  Plaintiff did acknowledge feeling pain in his back during the evaluation, which was a little distracting.  Dr. Shively noted that plaintiff appeared at least mildly depressed, and that his expressive communication was well below average.  Plaintiff had fairly poor coordination.

Dr. Shively administered several tests, including WAIS-III, WMS-III, Trails A&B, Blender Gestalt Test, and Test of Memory Malingering (TOMM).  Plaintiff scored in the extremely low range on most sections of the WAIS-R test, which tested his cognitive functioning.  On the WMS-III test, which tested his memory functioning, plaintiff also scored extremely low.  On the Trails A&B test, plaintiff gave an impaired performance.  He exhibited a poor performance on the Bender Gestalt test, which Dr. Shively stated could have been associated with his hand numbness.  On the TOMM, plaintiff's scores indicated the possibility of malingering.  Dr. Shively found the cumulative results of the tests were well below normal and inconsistent with plaintiff's background as an honor student in high school, a solid work history, and years of living independently.  Specifically, Dr. Shively stated "[i]nterpretations of the results were provided but reasonable judgments about any of the data should be suspended given his

very poor performance on the test of memory malingering."  Dr. Shively cautioned that the results of the tests could have been attributed to plaintiff's distraction from pain, depressed mood or slow cognitive processing from his pain medications.  However, he opined that dementia or malingering should be considered if the brain MRI and blood tests were negative.  Dr. Shively's diagnoses were: Rule out mood disorder, rule out dementia, and rule out malingering.  Dr. Shively did not complete a medical source statement of plaintiff's ability to do work-related activities.

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

# IV.  DISCUSSION

In his motion for summary judgment, plaintiff argues that the ALJ erred in four ways in determining that he was not disabled.  Specifically, plaintiff argues: (1) the ALJ's reliance on a non-treating physician's opinion does not support his conclusion that plaintiff can do a full range of light work; (2) the agency failed to secure necessary medical evidence that the ALJ requested post-hearing; (3) the ALJ misread Dr. Shively's report as eliminating disabling conditions; and (4) the hypothetical presented to the Vocational Expert was incomplete.

## A.  Non-Treating Physician's Opinion

Plaintiff argues the ALJ's reliance on an examining physician, Dr. McIntyre, was in error because Dr. McIntyre did not have all of plaintiff's medical information, including radiological reports.  He also argues that the treating physicians, Drs. Mullen, Jones and Lagios, are in the best position to gage plaintiff's limitations, because of their long-term experience with plaintiff and their increasing concern with his tics, tremors, and balance issues, and that their opinions should be controlling.  Plaintiff also argues that the ALJ failed to give specific and legitimate reasons, supported by substantial evidence in the record, for rejecting the treating physicians' opinions.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states his interpretation of the evidence, and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  See id. at 831.  In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

The ALJ found plaintiff had severe impairments, including cervical and lumbar degenerative disc disease and ataxia.  However, he found these impairments not severe enough to meet or medically equal the impairments listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff retains the residual functional capacity to perform a full range of light work, except he requires an at will sit/stand option, and cannot work at unprotected heights or around dangerous machinery.  He found plaintiff can understand, remember and carry out simple repetitive job instructions and tasks, but not detailed or complex job instructions or tasks.

///

1    Identifying Dr. McIntire's May 2002 assessment, the ALJ identified a loss of

2  range of motion in plaintiffs lumbar and cervical regions and very slight scoliosis of the lumbar

3  spine.  He also credited Dr. McIntire's finding that plaintiff's gait was stable and that he did not

4  exhibit guarding of the back when seated, that plaintiff could lift and carry 20 pounds

5  occasionally and no more than ten pounds frequently, but had no limitation in terms of sitting,

6  standing, walking and performing postural and manipulative activities.  The ALJ found the

7  opinion of Dr. McIntire persuasive, consistent with the record and well-supported by objective

8  findings, and accorded it significant weight.  The ALJ also credits plaintiff's treating physicians

9  at the Tahoe Fracture Clinic with identifying plaintiff's problems with imbalance in 2003.

10  However, the ALJ found plaintiff's treating physicians conjectured his imbalance difficulties

11  were associated with his medication regimen, and repeatedly advised reducing his narcotic pain

12  medication.  Specifically, the ALJ noted that Dr. Lagios has monitored plaintiff's condition over

13  a rather long period of time, and that Dr. Lagios questioned how his "history could be causing all

14  of his symptomatology"and assessed his involuntary movements as tic-like, which often can be

15  seen with narcotics and other medications, including stimulants.  He therefore assigned

16  significant weight to Dr. Lagios' assessment.

17    The ALJ also noted that Dr. Mullen, another of plaintiff's treating physicians,

18  found his condition to be stable and limited him to light duty.  The ALJ found that Dr. Mullen's

19  contention that plaintiff should be considered permanently totally disabled from a neurological

20  standpoint was ambiguous and assigned no weight to this conclusion as it was not supported by

21  objective findings.  Rather, the ALJ found Dr. Mullen's conclusion was drawn from inferences in

22  plaintiff's history and subjective complaints.  The ALJ also noted that this type of decision is

23  reserved to the Commissioner, and that he is not bound to accept a physician's conclusion

24  particularly when, as here, the opinion is not supported by detailed clinical diagnostic evidence.

25    Next the ALJ identified the limitations set forth by the State Agency medical

26  consultants, including that plaintiff was capable of light work tasks in that he was able to

18

1   lift/carry 20 pounds occasionally and ten pounds frequently; stand/walk for six hours in an eight-

2   hour day; sit for six hours in an eight-hour day; and push/pull in an unlimited manner.  The ALJ

3   concluded these opinions were consistent with the record, and therefore persuasive.

4           The ALJ found plaintiff continues to have problems with cervical and lumbar disc

5   degeneration and ataxia, but that despite these conditions the opinions of the treating and

6   examining physicians support the findings regarding plaintiff's ability to perform work-related

7   activities.  He found that even with the limitations that plaintiff's conditions impose, he has the

8   ability to perform a full range of light work that allows for a sit/stand option at will, if he is not

9   exposed to unprotected heights or dangerous machinery, and that does not involve detailed or

10  complex job instructions or tasks.

11          The ALJ also found that although plaintiff "experiences involuntary movements,

12  neurological examination has not established a definite etiology . . . [and] [t]reating physicians

13  have suggested the interplay between the claimant's narcotic medication regimen and his ataxia."

14          The ALJ's findings indicated that he credited both plaintiff's treating and

15  examining doctors.  Plaintiff points out that the ALJ's misquotes plaintiff's treating physician,

16  Dr. Lagios, regarding his symptomatology.  The ALJ stated that Dr. Lagios questioned how

17  plaintiff's history could be causing his symptomatology.  In fact, what Dr. Lagios questioned was

18  how plaintiff's back injury could be causing his involuntary movements.  Essentially, Dr. Lagios

19  thought the involuntary movements were unrelated to his back injury, but he does not appear to

20  have questioned his symptoms.  The involuntary movements Dr. Lagios was addressing, seem to

21  have begun in late 2002.  Dr. Mullen was the first physician to acknowledge observation of any

22  ataxia or balance issues in November 2002.  Therefore, they appear not to have been present

23  during Dr. McIntire's examination of plaintiff.  Accordingly, Dr. McIntire did not address these

24  involuntary movements, or indicate any limitations they would cause plaintiff.

25          The court finds that Dr. McIntire's opinion was supported by independent clinical

26  findings.  Thus, the use of Dr. McIntire's specific limitations, as to plaintiff's back injury, was

1   not erroneous.  Dr. McIntire's report was consistent with plaintiff's treating physician, and Dr.

2   McIntire placed similar restrictions on plaintiff's abilities.  However, Dr. McIntire did not

3   address plaintiff's ataxia or his involuntary movements.  The ALJ identified the ataxia as a

4   serious condition, but found that no neurological examination has established a definite etiology

5   for the involuntary movements.  Dr. Mullen opined that plaintiff should be considered totally

6   disabled from a neurological standpoint.  The ALJ found this conclusion ambiguous and not

7   supported by objective findings.  He therefore rejected this opinion.  Although this was not

8   erroneous and the ALJ rejected the opinion for clear and convincing reasons, the ALJ had a duty

9   to develop the record as to this condition, as discussed below.

10           Dr. Pathak, who conducted a neurologic examination of plaintiff, found that

11  plaintiff had decreased sensation in his extremities and that he would have some manipulative

12  limitations including only occasionally reaching, handling, fingering, and feeling.  The ALJ did

13  not address this finding at all.  It appears clear to the court that plaintiff may have some

14  neurologic condition causing his ataxia and involuntary movements.  Several physicians have

15  suggested the need for a brain MRI to determine if there is a medical cause of the ataxia, and to

16  rule out that plaintiff is malingering.  Therefore, the court finds that the ALJ did not err in his

17  reliance on the examining physician's opinion in regards to plaintiff's back injury and limitations

18  pursuant thereto.  However, as discussed below, prior to rejecting plaintiff's treating physician's

19  limitations as to his neurological issues, the ALJ had a duty to develop the record.  On remand,

20  the ALJ should reconsider plaintiff's limitations due to any neurological issues identified upon

21  further development of the record.

22                   **B.  Post-Hearing Medical Evidence**

23           Plaintiff argues the record here is not complete enough to deny benefits without

24  the MRI the ALJ requested.  He states that the disabling tics, tremors and balance problems exist

25  whether or not a source has been specifically labeled.

26  / / /

1        The ALJ has an independent duty to fully and fairly develop the record and assure

2   that the claimant's interests are considered.  See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th

3   Cir. 2001).  When the claimant is not represented by counsel, this duty requires the ALJ to be

4   especially diligent in seeking all relevant facts.  See id.  This requires the ALJ to "scrupulously

5   and conscientiously probe into, inquire of, and explore for all the relevant facts."  Cox v.

6   Califano, 587 F.2d 988, 991 (9th Cir. 1978).   The ALJ's duty to develop the record further is

7   triggered only when there is ambiguous evidence or when the record is inadequate to allow for

8   proper evaluation of the evidence."  Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001)

9   (citing Tonapetyan, 242 F.3d at 1150).  Ambiguous evidence or the ALJ's own finding that the

10  record is inadequate triggers this duty.  See Tonapetyan, 242 F.3d at 1150.  The ALJ may

11  discharge the duty to develop the record by subpoenaing the claimant's physicians, submitting

12  questions to the claimant's physicians, continuing the hearing, or keeping the record open after

13  the hearing to allow for supplementation of the record.  See id. (citing Tidwell v. Apfel, 161 F.3d

14  599, 602 (9th Cir. 1998)).

15        Here, the record was incomplete and ambiguous.  Several physicians noted

16  plaintiff's difficulties with balance, involuntary movements and decreased sensation in his hands.

17  The doctors clearly stated that an MRI of plaintiff's brain was necessary to determine what the

18  cause of these symptoms were.  The examining psychiatrist, Dr. Shively, specifically stated that

19  an MRI was necessary to determine if there was an actual cause for these symptoms because if

20  not there was a possibility that plaintiff was malingering.  He stated that if there was no finding

21  as to the cause of plaintiff's neurological issues, then the possibility of malingering needed to be

22  explored more.

23        The ALJ clearly identified his duty to expand the record.  He submitted his

24  request for an MRI of plaintiff's brain to the Social Security Administration ("SSA").  However,

25  the SSA denied the request because they could not find a source to complete the MRI for the

26  amount they were willing to pay.  The SSA has a duty to purchase a consultative examination

21

1  when it is necessary due to a conflict, inconsistency, ambiguity or insufficiency in the evidence

2  that needs to be resolved. See 20 CFR § 404.1519a.  In this case, an MRI was necessary to

3  determine if plaintiff has a condition causing his neurological symptoms, or if not, whether

4  plaintiff could be malingering.

5     Defendant claims that the ALJ's request to the SSA was not definitive as to

6  whether the ALJ fulfilled his duty to develop the record.  He argues that the ALJ's decision

7  shows that the record evidence was adequate to allow for proper evaluation of the evidence.  The

8  court disagrees that the evidence was sufficient.  Regardless of whether or not the ALJ thought

9  the MRI was critical to the disposition of this case, the court finds that it is.  There is not

10  sufficient evidence in the record for a determination as to whether plaintiff has a neurological

11  condition causing his ataxia and involuntary movements, or whether he is malingering.  If

12  plaintiff has an actual neurological condition that can be diagnosed by an MRI, then his condition

13  needs to be evaluated as to what actual limitations his condition causes.  The ALJ appears to

14  have taken some of his symptoms in to account by finding that plaintiff cannot work at

15  unprotected heights or around dangerous machinery.  This appears to be a limitation related to

16  plaintiff's unsteady gait and involuntary movements.  However, these are not the only symptoms

17  identified by the treating and/or examining physicians.  Plaintiff has also identified limitations in

18  the sensations in his hands, which could mean limitations in his fine motor skills.  In fact, Dr.

19  Pathak found plaintiff limited in his handling and fingering ability.

20     Therefore, the court finds that the record is ambiguous or at least inadequate for

21  the ALJ to make a determination as to whether plaintiff has a disabling impairment.  The court

22  will remand this matter to the agency to further develop the record, including obtaining an MRI

23  of plaintiff's brain as requested by plaintiff's treating and examining physicians and the ALJ.

24     **C.  Dr. Shively's Report**

25     Plaintiff argues the ALJ committed reversible error by misreading Dr. Shively's

26  report and finding that plaintiff does not have a medically determinable mental impairment.

1    The ALJ noted that plaintiff was evaluated by Dr. Shively in 2004.  He stated that

2  Dr. Shively reported that plaintiff performed poorly on the memory malingering test and that the

3  results of the other tests were inconsistent with plaintiff's background.  He stated Dr. Shively

4  "recommended further medical tests and ruled out mood disorder, dementia and malingering."

5    In reviewing Dr. Shively's report, the court notes that this does misstate Dr.

6  Shively's findings.  In fact, Dr. Shively suggested additional tests were needed in order to rule

7  out mood disorder, dementia and malingering.  Dr. Shively found plaintiff's test results were well

8  below normal and inconsistent with plaintiff's background.  However, he suggested reasonable

9  judgment about any of the data from the examination should be suspended given plaintiff's poor

10  performance on the memory malingering test.  The only diagnosis Dr. Shively provided was to

11  rule out mood disorder, dementia and malingering.  There was no finding of any actual mental

12  disorder.

13    The court notes that plaintiff has not claimed any mental disability.  Neither in his

14  application nor in his motion did plaintiff argue that he has a mental disorder the ALJ should

15  have found to be severe.  Plaintiff only argues that the ALJ misread Dr. Shively's report.  The

16  court agrees that the ALJ misread the report as to Dr. Shively's diagnosis.  However, especially

17  given that plaintiff is not claiming a mental disability, that does not constitute reversible error.

18    **D.  Hypothetical Question**

19    Finally, plaintiff argues that the hypothetical question posed to the vocational

20  expert ("VE") was incomplete in that it did not include any consideration of plaintiff's use of a

21  cane for ambulation, his history of falling, the decreased sensation in his hands, his tics, tremors,

22  dyskinetic movements, or motor ataxia with loss of balance.

23    Hypothetical questions posed to a VE must set out all the substantial, supported

24  limitations and restrictions of the particular claimant.  See Magallanes v. Bowen, 881 F.2d 747,

25  756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's limitations, the expert's

26  testimony as to jobs in the national economy the claimant can perform has no evidentiary value.

1   See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While the ALJ may pose to the

2   expert a range of hypothetical questions, based on alternate interpretations of the evidence, the

3   hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by

4   substantial evidence in the record as a whole.  See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th

5   Cir. 1988).

6          Here, the ALJ called a VE to testify at the administrative hearing.  The

7   hypothetical question he presented to the VE was as follows:

8              Assume a hypothetical person with the same age, education, and
               work experience as the Claimant.  Further assume first [he] can
9              perform a full range of light work except he requires an at-will
               sit/stand option.  He cannot work at unprotected heights or around
10             dangerous machinery.  He can understand, remember, and carry out
               simple, repetitive job instructions and tasks, but not detailed or
11             complex job instructions or tasks.

12         In response to this hypothetical, the VE testified that there are jobs in the national

13  economy this person could perform, including a touch-up or rework person, an assembler of

14  plastic products, and a gate guard.  Plaintiff's representative then asked if such an individual

15  would be able to perform the job of touch-up or rework person if he had a neurological problem

16  where he was unable to grasp or carry or lift.  The VE stated that, taking a complete, literal

17  interpretation of not being able to grasp, then he would not be able to do this job.  The

18  representative then asked the VE whether the other jobs, assembler or gate guard, could

19  accommodate the need to lay down.  The VE testified usually not.  However, the representative

20  did not ask the VE about these other two positions if the worker had fine motor skill limitations.

21         The ALJ's hypothetical to the VE included plaintiff's limitations for his back

22  injury.  It also included a limitation of working at heights and around dangerous machinery.

23  These limitations were presumably related to plaintiff's imbalance and ataxia issues.  However,

24  the hypothetical the ALJ presented did not include limitations as to plaintiff's potential fine

25  motor skill limitations.  If plaintiff is found to have a neurological condition causing decreased

26  sensation in his hands as well as tics and tremors, his fine motor skills may be affected.  This

24

1  could have an impact on his ability to perform the jobs the VE proposed.  Therefore, the court

2  finds the hypothetical did not reflect all the plaintiff's possible limitations.   On remand,

3  depending on the results obtained in developing the record, the ALJ may need to hold another

4  administrative hearing to consider whether there are jobs plaintiff can perform given his

5  functional capabilities.

## V.  CONCLUSION

7          For the foregoing reasons, this matter will be remanded under sentence four of 42

8  U.S.C. § 405(g) for further development of the record and/or further findings addressing the

9  deficiencies noted above.

10         Accordingly, IT IS HEREBY ORDERED that:

11         1.      Plaintiff's motion for summary judgment (Doc. 15) is granted;

12         2.      The Commissioner's cross motion for summary judgment (Doc. 19) is

13  denied;

14         3.      This matter is remanded for further proceedings consistent with this order;

15  and

16         4.      The Clerk of the Court is directed to enter judgment and close this file.

18  DATED: May 1, 2008

19                                  _____
                                    Craig M. Kellison
20                                  **CRAIG M. KELLISON**
                                    UNITED STATES MAGISTRATE JUDGE